297 Ga. 513
FINAL COPY

S15A0146.  OASIS GOODTIME EMPORIUM I, INC. et al. v. CITY OF DORAVILLE et al.

NAHMIAS, Justice.

Oasis Goodtime Emporium I, Inc., d/b/a Oasis, which describes itself as a "restaurant featuring nude dance entertainment and alcohol service," appeals to this Court to preserve those two pillars of its business — nudity and alcohol. Oasis asserts that when its employees dance nude and serve alcohol, they are clothed with constitutional free speech protection, which the City of Doraville's Code of Ordinances attempts to strip away.  Oasis contends that it should not be subject to the Doraville Code at all because the legislation making its land a part of Doraville is void due to an alleged statutory notice defect, and that various portions of the Code are unconstitutional.  We conclude, however, that Oasis is properly subject to Doraville's Code and that the City's regulations do not violate the club's constitutional rights, and we therefore affirm the trial court's order granting Doraville judgment on the pleadings.

1.      Oasis has operated in DeKalb County since about 1990.  Beginning

in 2001, Oasis operated under a settlement agreement that resolved litigation between DeKalb County and Oasis and several other adult entertainment businesses. The agreement granted Oasis and the other businesses "adult nonconforming status," meaning that they were "permitted to sell alcoholic beverages (subject to all other laws and regulation of alcohol) and to provide adult entertainment in the form of nude dancing or live nude performances."[1]

The City of Doraville is in DeKalb County. On March 29, 2012, the General Assembly passed Senate Bill (SB) 532, which amended the City's charter by redefining Doraville's boundaries, effective December 31, 2012; the new city limits encompass Oasis's location. On October 1, 2012, Doraville enacted Ordinance No. 2012-18, which established a sexually oriented business (SOB) code, located at § 6-400 et seq. of the Doraville Code of Ordinances.[2] The SOB code defines a "sexually oriented business" to include an "adult

---

[1] The 2001 agreement was originally set to expire after eight years, but then was amended to extend for another 15 years, with the option to renew for an additional 10 years. Under the agreement, Oasis was required to pay an annual fee to DeKalb County, which began at $55,000 and increased to $100,000 in 2007.

[2] Although all of the city regulations at issue in this case are part of the Doraville Code of Ordinances, the parties frequently refer to the chapters dealing with sexually oriented businesses, alcohol, and zoning as individual "codes," e.g., the "SOB code." We generally follow that practice in this opinion, using "code" to refer to a specific chapter and "Code" to refer to the full Doraville Code of Ordinances.

cabaret," which in turn is defined as "a nightclub, bar, juice bar, restaurant, bottle club, or similar commercial establishment that regularly features live conduct characterized by semi-nudity. No establishment shall avoid classification as an adult cabaret by offering or featuring nudity." Code § 6-401. Under this definition, Oasis is a sexually oriented business.[3] Employees of sexually oriented businesses are prohibited from appearing fully nude, but semi-nudity is permitted. See Code § 6-416 (a).[4] Sexually oriented businesses are also prohibited from selling alcohol. See Code § 6-416 (d) ("No person shall possess, use, or consume alcoholic beverages on the premises of a sexually oriented business.").

---

[3] Although Oasis asserted at oral argument that it does not want to be classified as a sexually oriented business under the Code, Doraville is treating Oasis as such a business, and Oasis has made no argument that it does not meet the definition of a sexually oriented business.

[4] Code § 6-416 (a) says: "No patron, employee, or any other person shall knowingly or intentionally, in a sexually oriented business, appear in a state of nudity or engage in a specified sexual activity." Code § 6-401 defines the forbidden "nudity" as "the showing of the human male or female genitals, pubic area, vulva, or anus with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any part of the nipple and areola." The permissible "semi-nudity" is defined as

the showing of the female breast below a horizontal line across the top of the areola and extending across the width of the breast at that point, or the showing of the male or female buttocks. This definition shall include the lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breast exhibited by a bikini, dress, blouse, shirt, leotard, or similar wearing apparel provided the areola is not exposed in whole or in part.

3

In December 2012, Oasis applied to Doraville for a 2014 alcohol license, and Oasis and its owners (collectively, "Oasis") also filed a complaint against Doraville, its Mayor, the members of the City Council, and the City Clerk (collectively, "Doraville"), challenging provisions of the City's SOB, alcohol, and zoning codes.[5]  On January 14, 2013, Doraville denied Oasis's application for an alcohol license.  Oasis later amended its complaint in this case twice, and Doraville filed answers to both amended complaints.  Doraville also moved for judgment on the pleadings, and the trial court granted that motion on April 18, 2014.[6]  Oasis now appeals to this Court, invoking our jurisdiction over constitutional questions.  See Ga. Const. of 1983, Art. VI, Sec. VI, Par. II (1).

---

[5]  In addition, Oasis challenged Code § 11-125, found in the food service and entertainment chapter.  At the time Oasis filed its complaint, § 11-125 (a) said: "It shall be unlawful for any person to display or permit the display of the human torso incidental to the dispensing of food, beverages or entertainment or otherwise unless the breast[s], genitals and buttocks are fully covered with nontransparent materials."  That section was repealed on April 15, 2013, and Oasis does not challenge the now-repealed section on appeal or allege that § 11-125 was ever applied to it.  Oasis also alleged that Doraville is bound by the agreement between Oasis and DeKalb County granting Oasis "adult nonconforming use," but Oasis appears to have abandoned that claim on appeal.  See Trop, Inc. v. City of Brookhaven, 296 Ga. 85, 88-89 (764 SE2d 398) (2014) (rejecting another adult entertainment club's attempt to enforce the same agreement with DeKalb County against the City of Brookhaven).

[6]  All of Doraville's ordinances challenged by Oasis on appeal were attached as exhibits to one or more of Oasis's complaints or Doraville's answers, so the trial court could properly consider them in ruling on the motion for judgment on the pleadings.  See OCGA §§ 9-11-10 (c), 9-11-12 (c); Trop, 296 Ga. at 89.

4

2.      Seeking to avoid the Doraville Code entirely, Oasis argues that SB 532, which amended the City of Doraville's charter by redefining the City's boundaries to encompass the land on which Oasis operates, is invalid because the notice requirement of OCGA § 28-1-14 (b) was not satisfied. We conclude that Oasis lacks legal standing to pursue this claim.

OCGA § 28-1-14 implements the provision of the 1983 Georgia Constitution stating that "[t]he General Assembly shall provide by law for the advertisement of notice of intention to introduce local bills." Art. III, Sec. V, Par. IX. With regard to a local bill amending a municipal charter, the statute requires that notice must be given in two different ways before the bill becomes law. Subsection (a) of § 28-1-14, which applies to all local bills, requires that notice of the intention to introduce such a bill be advertised in the local newspaper for legal notices one time no later than the week before the bill is introduced. Subsection (b) imposes an additional requirement when the local bill would amend "the charter of a municipality or the enabling Act of the governing authority of a county or a consolidated government." For these bills,

> a copy of the notice of the intention to introduce local legislation required by subsection (a) of this Code section [must be] mailed, transmitted by facsimile, or otherwise provided to the governing

5

authority of any county, municipality, or consolidated government referred to in the bill during the calendar week in which such notice is published as provided in subsection (a) of this Code section or during the seven days immediately following the date of publication of such notice.

OCGA § 28-1-14 (b).[7]

SB 532 amended Doraville's incorporating act to revise the corporate

---

[7] OCGA § 28-1-14 says in full:

(a) No local bill shall become law unless notice of the intention to introduce such bill shall have been advertised in the newspaper in which the sheriff's advertisements for the locality affected are published one time before the bill is introduced. Such advertisement must be not more than 60 days prior to the convening date of the session at which the bill is introduced. After the advertisement has been published the bill may be introduced at any time during that session unless the advertisement is published during the session, in which event the bill may not be introduced before Monday of the calendar week following the week in which the advertisement is published.

(b) No local bill amending the charter of a municipality or the enabling Act of the governing authority of a county or a consolidated government shall become law unless a copy of the notice of the intention to introduce local legislation required by subsection (a) of this Code section is mailed, transmitted by facsimile, or otherwise provided to the governing authority of any county, municipality, or consolidated government referred to in the bill during the calendar week in which such notice is published as provided in subsection (a) of this Code section or during the seven days immediately following the date of publication of such notice. A single notice sent by United States mail, postage prepaid, addressed to the governing authority of the county, municipality, or consolidated government at the official address of such governing authority shall satisfy the requirement of this subsection. If such notice is mailed, the notice requirement of this subsection shall be presumed to have been met by depositing the copy of the required notice in the United States mail. For purposes of this subsection, the copy of the notice provided to such governing authority may consist of an actual or photostatic copy of the published notice or a typed restatement of the contents of such notice.

(c) A copy of the notice as it was advertised and an affidavit stating that the notice has been published as provided by this Code section and that the notice requirements of this Code section have been met shall be attached to the bill and shall become a part of the bill. Such affidavit shall be made by the author of the bill.

limits, so the bill was subject to both notice requirements. It is undisputed that the requirement in OCGA § 28-1-14 (a) was satisfied. On Thursday, March 8, 2012, The Champion, DeKalb County's newspaper for legal notices, published the following:

> NOTICE OF INTENTION TO INTRODUCE LOCAL LEGISLATION: Notice is given that there will be introduced at the regular 2012 session of the General Assembly of Georgia a bill to change the corporate limits of the city of Doraville and for other purposes.

SB 532 was introduced two calendar weeks after that, on Tuesday, March 20; the bill passed on March 29.

Oasis contends that the notice requirement in OCGA § 28-1-14 (b) was not satisfied. We need not decide this question, however, because Oasis lacks standing to challenge the validity of the notice of SB 532 that was required to be given to the City of Doraville.[8] Oasis maintains that because it has been

---

[8] Resolving the merits of this notice question might not be easy. Doraville argues that the local government notice requirement was met because the City Clerk averred that the City received a copy of The Champion every week in 2012 and because State Representative Elena Parent sent Doraville's Mayor and City Council members an e-mail on February 29 discussing her plan to run the newspaper notice and another e-mail on March 11 saying that the notice had run and that she planned to have the bill finalized the next day. However, subsection (b) of OCGA § 28-1-14 imposes a *separate* requirement that the notice required by subsection (a) be transmitted to the local government. It is clearly meant to give a local government whose charter or enabling act may be amended direct notice, rather than only the notice by publication that is given to the general public pursuant to subsection (a). If it sufficed simply to show that the governing authority, like the

7

injured by SB 532, which brought it within the domain of Doraville's Code, it

has an interest in ensuring compliance with all of the procedures required by

---

members of the local public, received the newspaper in which the notice was published, subsection (b) would be rendered largely superfluous. See Berryhill v. Ga. Community Support & Solutions, Inc., 281 Ga. 439, 441 (638 SE2d 278) (2006) ("Courts should give a sensible and intelligent effect to every part of a statute and not render any language superfluous."). Nor did either e-mail from Rep. Parent satisfy the statutory requirement, because the February 29 e-mail was not sent during the calendar week in which the notice was published in the newspaper or during the seven days after publication, and while the March 11 e-mail was sent within the statutorily required time and referenced the newspaper notice, it did not include a "copy of the notice" or a "restatement of the contents of such notice." OCGA § 28-1-14 (b).

Then again, the e-mails do show that Doraville's governing authority had actual notice of SB 532's impending introduction, and it is possible that this substantial compliance with the objective of subsection (b) was enough. Compare OCGA § 1-3-1 (c) ("A substantial compliance with any statutory requirement, especially on the part of public officers, shall be deemed and held sufficient, and no proceeding shall be declared void for want of such compliance, unless expressly so provided by law."), with Cook v. NC Two, L.P., 289 Ga. 462, 464-465 (712 SE2d 831) (2011) ("[W]here a statute is 'plain and susceptible of but one natural and reasonable construction, . . . the legislature's clear intent . . . will not be thwarted by invocation of the rule of "substantial compliance."'" (citation omitted)). Then again, OCGA § 28-1-14 (c) casts doubt on the proposition that any part of the statute can be satisfied by substantial compliance, by requiring that a copy of the notice as published and an affidavit by the author of the bill "stating that the notice has been published as provided by this Code section and that the notice requirements of this Code section have been met" be attached to the bill so it becomes part of the bill. This Court has said that if such an attachment is not made, the law is invalid – but we have also said that the attachment to the enrolled bill is controlling on the question of whether the required notice was provided. See Bleckley v. Vickers, 225 Ga. 593, 594 (170 SE2d 695) (1969) ("'When the enrollment of any local or special bill has incorporated therein the required proof of notice, and after it has been properly signed and filed with the Secretary of State, it will not only impute absolute verity as to its contents, but it will also conclusively show upon its face its validity with respect to the constitutional requirements as to proof of notice; whereas, if such enrollment fails to show the required proof of notice, it is upon its face invalid.'" (citation omitted)). In this case, SB 532 had attached to it a copy of the notice published on March 8, 2012 and an affidavit from Senator Fran Millar, who was a sponsor of the bill, saying that notice of the bill "was published in the Champion which is the official organ of DeKalb County on March 8, 2012, and that the notice requirements of Code Section 28-1-14 have been met." Although the affidavit says nothing specifically about notice to the City, under our case law, the enrollment of the bill saying that the statutory "notice requirements" were met might be deemed to "conclusively" establish that fact. See Bleckley, 225 Ga. at 594.

8

OCGA § 28-1-14. But a party only has standing to assert a procedural right "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." Lujan v. Defenders of Wildlife, 504 U.S. 555, 573, n. 8 (122 SCt 2130, 119 LE2d 351) (1992).[9]

OCGA § 28-1-14 (a) is clearly designed to protect the interests of the public that may be affected by the amendment of a local law, by requiring notice to the local public of the introduction of such a bill. Oasis, as a business in the area that stood to be affected by SB 532, would have standing to complain had the notice required by subsection (a) not been given — but that notice was properly given. OCGA § 28-1-14 (b) is clearly designed to protect a different interest — the interest of a local government entity in notice of a potential amendment to its organic law. Subsection (b) does not require that anything be done with regard to the public, whose interest in notice is addressed by subsection (a). See, e.g., GE Capital Mortgage Svcs., Inc. v. Clack, 271 Ga. 82, 83 (515 SE2d 619) (1999) (holding that a party who was given notice of a tax

---

[9] This Court has previously cited Lujan in assessing standing under Georgia law. See Granite State Outdoor Advertising, Inc. v. City of Roswell, 283 Ga. 417, 418 (658 SE2d 587) (2008).

sale as statutorily required "may not attack the sale on the ground of lack of notice to another party"); Ueal v. AAA Partners in Adoption, Inc., 269 Ga. App. 258, 260 (603 SE2d 672) (2004) (explaining that only the "person harmed by the lack of notice to him" may raise the issue); Ryder Automobile Leasing Co. v. Tates, 112 Ga. App. 18, 20 (143 SE2d 411) (1965) ("'As a general rule, the question of defective service may be raised only by the one on whom attempted service was made, and one defendant is not entitled to urge defects in the service on a co-defendant.'" (citation omitted)).

Nevertheless, citing cases like Brown v. Clower, 225 Ga. 165, 166 (166 SE2d 363) (1969), Oasis argues that the purpose of the local legislation notice statute is to protect the interests of the public. See id. at 166 ("[T]he purpose of the advertisement as to local legislation . . . is to 'protect the people against covert or surprise legislation.'" (citation omitted)). The cases Oasis cites, however, were decided at a time when the only notice required was by newspaper publication. See Ga. Const. of 1945, Art. III, Sec. VII, Par. XV (requiring that notice of intention to introduce a local bill be published in the newspaper in the affected area). This general notice requirement was meant to protect both the public and the affected local government. See Fleming v.

10

Daniell, 221 Ga. 43, 45 (142 SE2d 804) (1965) (explaining that one of the main purposes of the constitutional notice requirement was "to prevent duties and obligations being imposed on local governments without giving those in charge of such governments an opportunity to oppose their passage."). This continued to be the law under the 1983 Constitution, with the notice requirement placed in OCGA § 28-1-14.

In 1996, however, the government notice requirement was separated from the public notice requirement, with the addition to the statute of subsection (b). See Ga. L. 1996, p. 1198. The title of the 1996 act explained that OCGA § 28-1-14 was being amended "to provide that a notice of intention to introduce local legislation be provided to the governing authority of any county, municipality, or consolidated government affected by such legislation." Id. And the language of OCGA § 28-1-14 (b) makes plain that the purpose of this additional notice requirement was not to provide a second way for people in general to learn about potential local legislation but rather to directly notify the local government so that it could respond.[10]

---

[10] This understanding is supported by the original subsection (b) (3) of the 1996 statute, which said that direct notice to the local government was not required when the local bill was "requested by resolution or other written notification of the governing authority." OCGA § 28-1-14

11

Thus, only the local government whose interest OCGA § 28-1-14 (b) protects — here, the City of Doraville — has standing to contest compliance with that notice requirement. Doraville has not complained about a lack of notice, or indeed about the enactment of SB 532. And Oasis has no legal entitlement to complain. Consequently, we need not, and do not, determine whether there was adequate compliance with OCGA § 28-1-14 (b) when SB 532 was introduced and passed into law.

3. Having established that Oasis is subject to the Doraville Code of Ordinances, we turn next to the club's constitutional challenges to the substance of the sexually oriented business code. Oasis is correct that the SOB code implicates constitutional freedom of expression. Erotic dancing — which includes the type of dancing while nude done by Oasis's employees — is a form of expression protected by the free speech provisions of both the United States and Georgia Constitutions. See, e.g., Gravely v. Bacon, 263 Ga. 203, 205

---

(b) (3) (1996). The governing authority's making of such a request would not notify the public that the local law requested was actually going to be introduced, but it obviously would demonstrate that the governing authority was aware of the bill. This subsection was removed in 2002, when specific notice procedures for annexation through local acts were repealed, see Ga. L. 2002, p. 985, §§ 1, 3, but nothing in the repealing bill suggests that the purpose of the government notice requirement in OCGA § 28-1-14 (b) changed or that it was now meant to provide a second way for the public to be notified of impending local legislation.

(429 SE2d 663) (1993); <u>Harris v. Entertainment Systems</u>, 259 Ga. 701, 702 (386

SE2d 140) (1989).  See also <u>Barnes v. Glen Theatre, Inc.</u>, 501 U. S. 560, 566

(111 SCt 2456, 115 LE2d 504) (1991) (plurality opinion) ("[N]ude dancing of

the kind sought to be performed here is expressive conduct within the outer

perimeters of the First Amendment, though we view it as only marginally

so.").[11]  But free speech protection only goes so far; protected expression may

sometimes be restricted in limited ways when justified by sufficient government

---

[11] The First Amendment to the United States Constitution says "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."  Art. I, Sec. I, Par. V of the 1983 Georgia Constitution says, "No law shall be passed to curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish sentiments on all subjects but shall be responsible for the abuse of that liberty."  Although Oasis raised both federal and state constitutional claims in the trial court, on appeal it invokes only the free speech protection of the Georgia Constitution.

Doraville argues that the Georgia Constitution provides less free speech protection than the First Amendment and that under a proper interpretation of our state constitution, nude dancing is not protected at all.  Discussing the text and history of the state provision, Doraville asserts that cases such as <u>Gravely</u> and <u>Harris</u>, where this Court held that nude dancing is protected under the state constitution, should be abandoned because they relied primarily on federal precedent.  However, "[a]s far back as 1932, this Court [has] looked to federal cases interpreting the First Amendment for guidance in applying Georgia's free speech guarantee."  <u>Grady v. Unified Government of Athens-Clarke County</u>, 289 Ga. 726, 728 (715 SE2d 148) (2011).  And in 1982, we said that "'[i]n the absence of controlling state precedent this court has applied analogous First Amendment standards when construing the state constitution.'"  Id. (quoting <u>Paramount Pictures Corp. v. Busbee</u>, 250 Ga. 252, 255, n. 5 (297 SE2d 250) (1982)).  Doraville's argument – which Oasis heartily disputes – is interesting, and its position was once endorsed by two members of this Court.  See <u>Harris</u>, 259 Ga. at 705 (Weltner, J., joined by Marshall, C. J., dissenting) ("I cannot believe that our forebears, in writing these protections, intended to vest in each Georgian a constitutional right to dance naked for tips in a barroom.  Nor do I think that the citizens of Georgia who ratified the Constitution of 1983 intended to preserve or to create any such 'right.'").  But we see no need to reconsider our precedents on this point in this case, because as we explain below, even treating nude dancing as protected speech, Doraville's regulations are constitutional.

13

interests, without violating the Constitution. See State v. Café Erotica, 269 Ga. 486, 488-489 (500 SE2d 574) (1998); Harris, 259 Ga. at 701-702.

(a)    In considering whether the SOB code restricts free expression in a constitutionally permissible way, we first determine if the regulation is content-neutral and thus subject to intermediate, rather than strict, judicial scrutiny. See Café Erotica v. Peach County, 272 Ga. 47, 49 (526 SE2d 56) (2000); State v. Café Erotica, 269 Ga. at 489 (explaining that regulations targeting the content of protected speech are subject to strict scrutiny and thus must be "'necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end'" (citation omitted)).

> [T]he principal inquiry in determining whether a legislative act is content-neutral is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys.  The government's purpose is the controlling consideration.  A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."  An ordinance designed to combat the undesirable secondary effects of sexually explicit businesses is content-neutral. Before enacting an ordinance to combat undesirable secondary effects, a legislative body is required to consider specific evidence of the undesirable secondary effects that it reasonably believes relevant to the problems it seeks to address by passing the ordinance.

Goldrush II v. City of Marietta, 267 Ga. 683, 690 (482 SE2d 347) (1997)

14

(citations omitted). "'"[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute" on the ground that "a punitive purpose in fact lay behind the statute,"'" and even statements by individual officials may not prove a government's purpose because "what motivates one legislator to make a comment about a law is not necessarily what motivates fellow legislators to enact the law." Id. at 691-692 (citations omitted).

Oasis contends that the trial court erred in holding that the SOB code is content-neutral. The club argues that because the court granted Doraville judgment on the pleadings, the court was required to take as true the allegations in Oasis's amended complaint stating that Doraville's motive in passing the SOB code was to target Oasis and that the reason for the regulations offered by Doraville — targeting the negative secondary effects of sexually oriented businesses — was pretextual.

The preamble to Ordinance No. 2012-18, which enacted the SOB code, recites the City Council's findings that sexually oriented businesses "are frequently used for unlawful sexual activities, including prostitution and sexual liaisons of a casual nature"; that "there is convincing evidence that sexually oriented businesses, as a category of establishments, have deleterious secondary

15

effects and are often associated with crime and adverse effects on surrounding properties"; and that the Council "desires to minimize and control these adverse effects and thereby protect the health, safety, and welfare of the citizenry." The preamble specifies that Doraville's intention is to regulate sexually oriented businesses "through a narrowly tailored ordinance designed to serve the substantial government interest in preventing the negative secondary effects of sexually oriented businesses."

Ordinance No. 2012-22, which was passed a month later, amended the SOB code to, among other things, "adopt[ ] and incorporate[ ] herein [the City Council's] stated findings and legislative record related to the adverse secondary effects of sexually oriented businesses, including the judicial opinions and reports related to such secondary effects, that were before the City Council with Ordinance 2012-18." The incorporated legislative record, which was also part of the record before the trial court, includes a bevy of studies, reports, and cases illuminating the dark underbelly of sexually oriented businesses and examining the negative secondary effects associated with those businesses. Doraville's stated reliance on these materials was sufficient evidence that the City's purpose in enacting the SOB code was to combat undesirable secondary effects. See

16

Goldrush II, 267 Ga. at 691-692 (concluding that the evidence offered by the city, including the ordinance's preamble and the transcript of the city council meeting showing a discussion of negative secondary effects, established that the "predominate intent" of the ordinance was to combat negative secondary effects).

Oasis did not allege in its pleadings any facts to refute Doraville's stated reliance on these materials in enacting the SOB code, and it has not alleged any facts to show that Doraville adopted the ordinance to target a certain message. Oasis did allege that it is the sole business affected by the SOB code. Even taking this factual allegation as true, however, the trial court was not required to take as true Oasis's conclusion that because it is the only business affected at this time, Doraville was targeting Oasis's expression and Doraville's stated purpose of addressing negative secondary effects was pretextual. See Trop, Inc. v. City of Brookhaven, 296 Ga. 85, 87 (764 SE2d 398) (2014) ("While a trial court [ruling on a motion for judgment on the pleadings] is required to consider a non-moving party's factual allegations to be true, it is not required to accept the legal conclusions the non-party suggests that those facts dictate."). Oasis may be the only business currently affected by the SOB code, but that does not

17

establish that Doraville was targeting whatever message Oasis seeks to convey, as opposed to the risks of negative secondary effects associated with sexually oriented businesses in general. See Goldrush II, 267 Ga. at 691-692. We therefore conclude that the trial court correctly found the SOB code to be content-neutral. See Trop, 296 Ga. at 87 (holding that a similar sexually oriented business regulation was content-neutral).

(b) Content-neutral regulations that have an incidental effect on protected speech are reviewed under the three-part test established in Paramount Pictures Corp. v. Busbee, 250 Ga. 252 (297 SE2d 250) (1982), which holds that the regulation is constitutionally permissible if (1) it furthers an important governmental interest; (2) it is unrelated to the suppression of speech; and (3) its incidental restriction of speech is no greater than essential to further the important governmental interest. See id. at 255-256.[12]

---

[12] Inverting Doraville's argument that the Georgia Constitution provides *less* free speech protection than the First Amendment, see footnote 11 above, Oasis argues that the state Constitution provides *more* free speech protection than the federal Constitution, and in particular that the third part of the Paramount Pictures test should be replaced with the "least restrictive means" requirement adopted in Statesboro Publishing Co. v. City of Sylvania, 271 Ga. 92, 95-96 (516 SE2d 296) (1999). As we explained in Grady, however, this Court's occasional statements suggesting that the 1983 Georgia Constitution "provides even broader protection" than the First Amendment, which originated in State v. Miller, 260 Ga. 669, 671 (398 SE2d 547) (1990), have not been supported by "any discussion of the text, history, or case law regarding the protection of free speech provided in the 1983 or previous Georgia Constitutions." Grady, 289 Ga. at 728-729. Grady also cast serious

18

Oasis first argues that the trial court erred in deciding at the pleadings stage that the SOB code actually furthers an important government interest, because the club must be permitted to present evidence challenging the studies and other materials on which the Doraville City Council relied in concluding that sexually oriented businesses cause negative secondary effects. For this argument, Oasis relies mainly on City of Los Angeles v. Alameda Books, Inc., 535 U. S. 425 (122 SCt 1728, 152 LE2d 670) (2002), in which the U. S. Supreme Court said that a municipality cannot "get away with shoddy data or reasoning" in crafting ordinances regulating sexually oriented businesses:

> The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in Renton [v.

doubt on the provenance and validity of Statesboro Publishing and its limited progeny, which are the only cases in which the Miller dictum has become an actual holding. See Grady, 289 Ga. at 729-731. But in any event, we have held that the Statesboro Publishing test applies only to laws that *directly* regulate the time, place, and manner of protected expression (such as the ordinance in that case, which prohibited the distribution of free printed material in driveways and yards), as opposed to regulations that have only an *incidental* effect on protected speech. See Great American Dream, Inc. v. DeKalb County, 290 Ga. 749, 751-752 & n. 7 (727 SE2d 667) (2012). Neither the Doraville Code's prohibition of the sale and consumption of alcohol (which is not protected expression) nor the prohibition of nudity (which is not itself protected expression) directly regulates protected speech. The Code restricts the protected expression of erotic dancing only incidentally by regulating the amount of clothing the dancers must wear and whether alcohol can be served in their vicinity. Accordingly, we will apply the Paramount Pictures test.

19

> Playtime Theatres, Inc., 475 U. S. 41 (106 SCt 925, 89 LE2d 29) (1986), to show that the ordinance is designed to serve a government interest]. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

Alameda Books, 535 U. S. at 438-439 (plurality opinion).

Even as amended twice, however, Oasis's complaint never alleged that the extensive materials on which Doraville expressly relied do not support the City's rationale for the SOB code or were inaccurate. Thus, Oasis failed to cast direct doubt on Doraville's proffered evidence supporting its interest in regulating sexually oriented businesses. See Alameda Books. at 442 (upholding a zoning ordinance restricting locations of sexually oriented businesses, and explaining that "our cases require only that municipalities rely upon evidence that is 'reasonably believed to be relevant' to the secondary effects that they seek to address" (citation omitted)); Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Florida, 630 F3d 1346, 1355-1360 (11th Cir. 2011) (granting summary judgment to the local government after finding that "the County has met its initial burden and that Peek-a-Boo has failed to cast direct doubt" on the studies the county relied on); Club Southern Burlesque, Inc. v. City of

Carrollton, 265 Ga. 528, 531 (457 SE2d 816) (1995) (holding that the city's "unrebutted evidence" that it "relied on specific studies which it reasonably believed to be relevant to the problems addressed by the ordinance" was sufficient to prove that the ordinance was designed to further an important government interest).

Oasis did allege that *it* has not caused any of the negative secondary effects Doraville seeks to avoid. But this Court and the United States Supreme Court have explained that it is not necessary for a local government to prove that the negative secondary effects it reasonably fears, based on evidence of problems experienced elsewhere, have already been experienced locally. See Café Erotica v. Peach County, 272 Ga. at 49; Renton, 475 U. S. at 51-52. Put another way, the Constitution does not require governments to forestall reasonable regulation until the mess meant to be avoided is proved to have arrived and now needs to be cleaned up. Indeed,

> it was not incumbent upon the [City] to prove the efficacy of the studies. To the contrary, the [City] was only required to prove that it considered "specific evidence of the pernicious secondary effects of adult entertainment establishments which it reasonably believed to be relevant to the problems addressed by the ordinance."

Parker v. Whitfield County, 265 Ga. 829, 829-830 (463 SE2d 116) (1995)

21

(citation and punctuation omitted). Because Oasis's pleadings did not challenge the materials on which Doraville relied or assert that the City's reliance on them was unreasonable, the trial court was permitted to render a judgment on the pleadings on this issue and to properly conclude that Doraville's SOB code furthers an important government interest.

(c) We next turn to applying the Paramount Pictures test to the two specific parts of the SOB code challenged by Oasis — the provision prohibiting sexually oriented businesses from serving alcohol, Code § 6-416 (d), and the provision prohibiting employees at sexually oriented businesses from appearing completely nude, Code § 6-416 (a).

(1) This Court has repeatedly upheld bans on alcohol in sexually oriented businesses against challenges under the Georgia Constitution. See, e.g., Trop, 296 Ga. at 87; Goldrush II, 267 Ga. at 692-693; Gravely, 263 Ga. at 206-207. Regulations like Code § 6-416 (d) satisfy the first part of the Paramount Pictures test because they further the important government interest in reducing negative secondary effects. It does not come as a shock that mixing alcohol with sexually provocative activity can result in undesirable consequences. This is borne out by many of the materials on which Doraville relied, which show

that negative effects result from the combination of alcohol consumption and sexually oriented businesses.

As for the second and third parts of the test, Code § 6-416 (d) is designed to alleviate negative secondary effects, not to suppress expression, and the incidental effect it has on the free expression of Oasis and its employees is minimal. Serving alcohol is not itself protected expression, and Code § 6-416 (d) leaves Oasis's employees free to express themselves as they wish through dance or otherwise. Moreover, like the similar ordinance we recently upheld in Trop, Doraville's alcohol prohibition applies only to sexually oriented businesses, and "mainstream performance houses, museums, or theaters" are not affected. Trop, 296 Ga. at 88. See also Gravely, 263 Ga. at 206-207 (explaining that the alcohol ban upheld there did not apply to private conduct or to "establishments [that] have not been shown to contribute to increased crime and neighborhood blight," such as concert halls, museums, and educational institutions). Compare Harris, 259 Ga. at 703-704 (striking down an ordinance that prohibited nudity at all establishments that served alcohol, including "at museums, at the opera, or at mainstream performance and movie theaters"). There remain ample opportunities and channels for dance and other free

23

expression in the City of Doraville.

(2) Whether a free-standing prohibition on full nudity in sexually oriented businesses meets the Paramount Pictures test is a closer question — and one that this Court appears not to have squarely addressed before. We conclude, however, that Doraville's Code § 6-416 (a) passes the Paramount Pictures test.

First, the ordinance furthers the asserted important government interest. Many of the materials considered by Doraville found a link between negative secondary effects and the presence of sexually oriented businesses of all varieties — not only strip clubs like Oasis but also businesses where alcohol is not served like adult book and video stores and movie theaters. One study, for example, showed that sexually oriented businesses attract predatory criminals because these businesses draw customers from a wide area and the patrons are "disproportionately male, open to vice overtures, [and] reluctant to report victimizations to the police," making them "soft targets." And several of the studies specifically address negative secondary effects — including illegal sexual activity — that proliferate in and around strip clubs. Because the intention of Doraville Code § 6-416 (a) is to mitigate these negative effects, and

24

not to suppress speech, it passes the first two parts of the Paramount Pictures test.

As for the third part of the test, it is true that dictating the type of costume an individual must wear while dancing — or, as the case here, dictating that the dancer wear at least *some* minimal kind of costume — imposes more of a restriction on protected expression than prohibiting alcohol in the vicinity. Code § 6-416 (a), however, strikes a constitutionally permissible fit between the objective of reducing undesirable secondary effects and the need to protect free speech.

To begin with, like the alcohol prohibition, the SOB code's proscription of full nudity applies only to sexually oriented businesses as defined in the code — not to private conduct; mainstream performance houses, museums, theaters, and other artistic, entertainment, and educational venues not regularly featuring live conduct characterized by semi-nudity or nudity; or the many other types of businesses that do not qualify as sexually oriented businesses. See Trop, 296 Ga. at 88. And although the City's regulation prohibits full nudity, it permits "semi-nudity," which means that a female dancer may choose to wear only pasties covering her areolae and a G-string covering her genital area and anus,

and a male dancer need only wear a G-string.

Oasis argues that this level of regulation is not sufficiently linked with the asserted government interest, and it is true that the materials on which Doraville relied do not make explicit a link between *full* nudity, as opposed to *almost full* nudity, and negative secondary effects. One study, for example, notes that sexually oriented businesses that "provide on-site entertainment" increase the opportunities for vice crime and customer-employee assaults, but that study does not specifically address the degree of nudity as a factor leading to those negative secondary effects. Similarly, the studies that focus specifically on strip clubs include reports of nude dancers engaging in illegal acts like public masturbation and prostitution, but do not evaluate whether such conduct would be mitigated if the dancers had to wear pasties and G-strings.

Although this Court has never directly addressed whether a full nudity ban, distinct from a ban on alcohol along with nudity, violates the Georgia Constitution, we can look to the relevant First Amendment precedent for guidance, as we often have done before. See Harris, 259 Ga. at 702; Paramount Pictures, 250 Ga. at 255, n. 5. In 1991, the United States Supreme Court held that requiring employees at a sexually oriented business to wear at least pasties

26

and G-strings does not violate the First Amendment. See Barnes, 501 U. S. at 565-566 (plurality opinion).

The Court addressed the issue again, and reached the same conclusion, in City of Erie v. Pap's A.M., 529 U. S. 277 (120 SCt 1382, 146 LE2d 265) (2000). The controlling plurality opinion found that the city's "asserted interests of regulating conduct through a public nudity ban and of combating the harmful secondary effects associated with nude dancing are undeniably important." 529 U. S. at 296. Moreover,

> [b]ecause the nude dancing at [issue] is of the same character as the adult entertainment at issue in Renton, Young v. American Mini Theatres, Inc., 427 U.S. 50 [(96 SCt 2440, 49 LE2d 310)] (1976), [which both dealt with movie theaters,] and California v. LaRue, 409 U. S. 109 [(93 SCt 390, 34 LE2d 342)] (1972), [which dealt with live entertainment,] it was reasonable for [the city] to conclude that such nude dancing was likely to produce the same secondary effects.

City of Erie, 529 U. S. at 296-297 (plurality opinion). The Court then explained:

> To be sure, requiring dancers to wear pasties and G-strings may not greatly reduce these secondary effects, but O'Brien requires only that the regulation further the interest in combating such effects.[13]

---

[13] City of Erie (and Barnes) applied the three-part First Amendment test for reviewing content-neutral regulations that was developed in United States v. O'Brien, 391 U. S. 367 (88 SCt

Even though the dissent questions the wisdom of [the city's] chosen remedy, the "'city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.'" It also may be true that a pasties and G-string requirement would not be as effective as, for example, a requirement that the dancers be fully clothed, but the city must balance its efforts to address the problem with the requirement that the restriction be no greater than necessary to further the city's interest.

City of Erie, 529 U. S. at 301 (plurality opinion) (citations omitted). In addition, while a nudity ban may have "some minimal effect on the erotic message by muting that portion of the expression that occurs when the last stitch is dropped, the dancers . . . are free to perform wearing pasties and G-strings. Any effect on the overall expression is *de minimis*." Id. at 294. In sum, "[t]he requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message." Id. at 301.

We agree with this reasoning. The pasties and G-string dress (or lack of dress) code required by § 6-614 (a) of the Doraville Code is a constitutionally

1673, 20 LE2d 672) (1968) – which is the test this Court adopted in Paramount Pictures for analysis of this sort of free speech issue under the Georgia Constitution. See 250 Ga. at 256 (citing O'Brien, 391 U. S. at 377). Under O'Brien, government regulation of protected expression is constitutional if it furthers an important government interest; if the interest is unrelated to the suppression of free expression; and if the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest. See 391 U.S. at 377.

28

valid balance between the City's desire to eliminate the negative secondary effects of sexually oriented businesses and the need to protect free expression. The Paramount Pictures test requires that an incidental restriction of protected speech be no *greater* than essential to further the important government interest, not no *lesser*. See 250 Ga. at 256. A local government may appropriately choose to adopt a content-neutral regulation that furthers its important interest in a slightly less restrictive way, thereby permitting more expression, even if that also slightly reduces the beneficial effects of the policy — for example, by allowing almost-nude but not fully-nude conduct in sexually oriented businesses.[14]

4. In addition to challenging Doraville's SOB code, Oasis seeks to challenge Code § 3-31, the provision of the City's alcohol code that prohibits the sale of alcohol in establishments that feature nudity.[15] The trial court

---

[14] Oasis also raises a generalized claim that the SOB code is overbroad, but the only argument made on this point is that the code is too broad in prohibiting nudity even where alcohol is not served. As just explained, such a restriction on full nudity in sexually oriented businesses – even teetotaling ones – is constitutional.

[15] At the time Oasis applied for an alcohol license, Code § 3-31 prohibited nudity at any establishment that served alcohol. The code has since been amended to add an exception for nude "conduct in theaters, concert halls, art centers, museums, or similar establishments that are primarily devoted to the arts or theatrical performances."

concluded that Oasis does not have standing to challenge *any* part of the alcohol code because it does not have a Doraville alcohol license. That holding was too broad. Oasis does not have a Doraville alcohol license because Doraville actually applied to Oasis a provision of the City's alcohol code. In denying Oasis's request for an alcohol license, Doraville noted several technical problems with the application but explained clearly that the "singular" reason for the denial was that Oasis qualified as a sexually oriented business and thus was prohibited from serving alcohol under § 6-416 (d) of the SOB code.

Accordingly, the application was denied under alcohol code § 3-21 (3), which says that an alcohol license will not be issued when "the granting of such license would constitute a violation of federal, state or local law . . . ." Because Oasis was denied a license under § 3-21 (3), the club would have standing to challenge *that* provision as unconstitutional. See Bo Fancy Productions, Inc. v. Rabun County Bd. of Commrs., 267 Ga. 341, 344 (478 SE2d 373) (1996). Compare Trop, 296 Ga. at 86, n. 1 (explaining that the trial court was correct in concluding that the Pink Pony did not have standing to challenge the Brookhaven alcohol code because the club had never applied for an alcohol license). To the extent Oasis raises such a challenge to § 3-21 (3), however, that

30

claim lacks merit. As discussed in Division 3 above, § 6-416 (d) of the SOB code is constitutionally valid in prohibiting alcohol in sexually oriented businesses, and § 3-21 (3) serves only to make the alcohol code consistent with the SOB code in this respect.

But the trial court was correct to the extent it held that Oasis lacks standing to challenge § 3-31 of the alcohol code. The first sentence of § 3-31 says: "It is the purpose of this section to regulate establishments licensed to sell, serve, or dispense alcoholic beverages . . . ." If Oasis possessed an alcohol license, it might be subject to penalties under § 3-31 for selling alcohol. But Oasis does not have an alcohol license, and its application for a license was not — and could not have been — denied based on § 3-31, which regulates only establishments that have already been "licensed to sell, serve, or dispense alcoholic beverages." Indeed, the City's letter denying the club's license application never mentions § 3-31. Consequently, Oasis lacks standing to challenge Code § 3-31. See Granite State Outdoor Advertising, Inc. v. City of Roswell, 283 Ga. 417, 421 (658 SE2d 587) (2008) (explaining that Georgia law does not "permit a party denied a permit based on the noncompliance with a constitutionally permissible provision to attack other provisions by which it was

not injured in any manner whatsoever" (footnote omitted)).

5. Oasis raises three other constitutional challenges to Doraville's Code, which may be quickly rebuffed. Oasis first argues that it has a vested and thus constitutionally protected interest in providing alcohol and nudity as it always has, so it is entitled to grandfathered status and should be permitted to operate without regard to the SOB and alcohol codes. As this Court has explained, however, while vested rights may, under certain circumstances, preclude "retroactive application of a *zoning* ordinance, the same is not applicable to *licenses* to conduct a business." Goldrush II, 267 Ga. at 698 (citation omitted; emphasis in original).

> Those who hold licenses that expire annually act at their peril and assume the risk that their licenses might not be renewed notwithstanding they have "committed their lives and their capital to building their businesses" which need licenses to operate.

Id. (citation omitted). See also Trop, 296 Ga. at 88 (rejecting "Pink Pony's erroneous arguments that it had some vested right to continue operation as a nude dancing club that serves alcohol" based on the club's prior agreement with DeKalb County).

Oasis next challenges Doraville's zoning ordinance on the grounds that

32

the City Council did not follow the City's requirements for passing an ordinance and that the zoning scheme does not leave sufficient locations available for sexually oriented businesses. On December 31, 2012, the day the expansion of Doraville's city limits became effective, the City Council enacted a zoning ordinance covering its new territory. The land on which Oasis sits was included in zoning category C-1 (neighborhood commercial), the same designation the land had under DeKalb County's zoning scheme. Although Doraville's zoning code restricts sexually oriented businesses to areas zoned M-2 (heavy manufacturing), the City's attorney has consistently represented in this litigation that Oasis is not required to move, and there is no allegation that the City has sought to apply its zoning code to affect Oasis. Thus, Oasis has not been injured by Doraville's zoning code and does not have standing at this time to challenge it. See Granite State, 283 Ga. at 420-421. See also Manlove v. Unified Govt. of Athens-Clarke County, 285 Ga. 637, 638 (680 SE2d 405) (2009) (finding no standing where the plaintiffs failed to show that the challenged ordinance had been enforced against them or that there was an imminent threat of

enforcement).[16]

Finally, Oasis contends broadly that many of the other provisions of the SOB and alcohol codes are unconstitutional as applied to the club. Oasis maintains that with regard to its as-applied challenges, judgment on the pleadings was necessarily improper because a trial court cannot rule on such challenges unless and until a factual record has been developed. However, the cases Oasis cites for this proposition actually say only that to present a justiciable claim, an as-applied challenge requires factual allegations showing how the challenged law actually has been (or is credibly threatened to be) applied to the plaintiff. See, e.g., GeorgiaCarry.Org, Inc. v. Georgia, 687 F3d 1244, 1255, n. 20, 1261, n. 34 (11th Cir. 2012). Oasis failed to allege any facts supporting an as-applied challenge to these other provisions of the Doraville Code, so the trial court's judgment on the pleadings rejecting those claims was proper.

Judgment affirmed. All the Justices concur.

---

[16] Because Doraville has not tried to apply its zoning code to Oasis, we also need not decide whether Oasis would be entitled to grandfathered status under the zoning code.

34

Decided June 15, 2015 – Reconsideration denied July 13, 2015.

Business Code; constitutional question. DeKalb Superior Court. Before Judge Jackson.

Begner & Begner, Alan I. Begner, Cory G. Begner; Linda I. Dunlavy; G. Brian Spears, for appellants.

Scott D. Bergthold, Bryan A. Dykes, for appellees.